Please the court, good morning. I'm Jeff Scriber. I'm here on behalf of Lacey Robinett and others similarly situated. I guess I'll start by giving the court a little bit of background. I know most of it set forth in the briefing. This relates to a claim of over billing by Regional One Medical Center, commonly known as the Med in Memphis, Connecticut. I'm here on behalf of Lacey Robinett, who was admitted as a Medicaid beneficiary after an automobile collision in December. Counsel, would you raise your podium just a little bit? Get your mic a little closer. Yes, Your Honor. I can hear a little bit better. Oh, okay. Excuse me. Let me back up a little bit. This relates to claims of Lacey Robinett individually and on behalf of others similarly situated in connection to billing practices of Regional One Medical Center, commonly known as the Med in Memphis, relating to their billing practices for Ms. Robinett and other Medicaid beneficiaries who are treated at that trauma center after being involved in traumatic injuries in which third parties potentially have exposure for negligent conduct. In other words, there's an associated tort claim. She was admitted in December of 2015 when she was air transferred after a collision. At the time, she was a Medicaid beneficiary, had been for some time under the Arkansas Medicaid program. She was admitted to the Med just as under a customary admission, nothing special, wasn't instructed anything special. She signed the normal assignment of benefits, forms, wherein she assigned the right to the Med to bill or seek reimbursement from the Medicaid program as well as other insurance. You know, it was the standard form. She was treated and released. And after her release, the Med unilaterally decided that they were not going to honor her Medicaid and instead they chose to file a lien for their quote customary charge. Is it not the case that medical providers are able to choose to accept or not apply for Medicaid reimbursement? That is the rule, but the interpretation of it is where this runs afoul, is that it is a voluntary program. There's no doubt about that, but there's also no doubt that the Med volunteered to participate in the program and they had a contract. Did the Med seek and or acquire funds through Medicaid to pay for this plaintiff's medical services? No, and that is the problem, and that's why we're here, because they chose to post facto opt out of that after they determined that it would be more lucrative for them to seek through a lien their customary charges, which are obviously significantly greater exponentially. What obligated them to seek reimbursement from Medicaid? Well, primarily federal law and state law, because while they don't per se obligate the Med to seek reimbursement from Medicaid, what they do is they require reporting requirements the state itself, and the Allborn case that came from this court is really the most comprehensive and controlling case that exists when up the United States Supreme Court about how the Medicaid system works and the tension between the system and the benefits provided in this anti-lien statute that prevents the system from being used either by the state or anyone else in a manner that deprives an injured person of their property rights. And Allborn essentially prevented the state of Arkansas from attempting to assert a lien for Medicare payments or Medicaid payments that the court determined fell outside of what the settlement value allocated for past medical. What's the case you're talking about? Allborn. Where is that? It's cited, I believe, in the Respondent's brief. The first site in their brief, I believe, is in the substantive portion of their brief is the Allborn case, but it is really the What's your best authority for the medical provider being obligated to seek reimbursement from Medicaid? Well, I mean, Allborn and the statutory backdrop from both the federal and state systems clearly demonstrate What statutory language are you referring to? The statutory language from the federal government is 42 U.S.C. 1396A25C, and there's an associated CFR, 42 CFR 447.15. What those do is they disallow a provider from charging a patient more than the Medicaid agreed upon amount when a provider is a Medicaid provider. So I'm not going to state to the court that if a procedure is followed correctly, that the med could not have tried to seek reimbursement for the agreed upon Medicaid amount, but that's not what they're seeking. They're seeking their customary charge, which is tenfold the Medicaid amount. But more importantly, they're violating the procedure that's set forth in the benchmark case of Allborn, which it discusses how the system works. And I'll kind of give you the layout of how the system works. Is it your basic position that the law is such that any medical provider that accepts Medicaid is legally duty-bound to first seek recovery under Medicaid as opposed to seeking an alternative? They are first required to report to Medicaid the existence of a potential third-party claim associated with the medical care. And thereafter, Medicaid can give them leave to seek the third-party, which in Arkansas never happens, and you'll see that from Allborn. They just pay it and then they chase later. What's happening here is they're circumventing that process. They're not informing the Medicaid system as is required, clearly under the Arkansas law and the statute and the regulations. I'll explain to you the regulations as well. The Medicaid handbook that they give states specifically that if you have a third-party liability issue, you are to take that to Medicaid, and they are to make the decision as to how the third-party issue is dealt with. And that's what Allborn says. Allborn stands for the propositions in the very of the Eighth Circuit case. Honestly, the Supreme Court just really repeated the good work from this court. But in the very first substantive paragraph in the Allborn decision, it says verbatim that in receiving Medicaid benefits, the beneficiary assigns in the form of a lien all rights to third-party claims. In other words, there was no right to assert a third-party claim that existed for the Med to take because the federal government required Arkansas to take it, and Arkansas took it. So they had to go through the state in order to get to the third-party claim. And the case they rely on the most heavily is this Miller case from Louisiana. And if you look at that case, it very specifically says that the state provided in the form of a statute a specific means for the provider to seek the third-party proceeds. So they were put on notice, and that's the big flaw with all the cases that they will produce to you. They will not show a single case to you where a provider has ever successfully unilaterally gone out and filed a lien without putting the Medicare agency on notice because it creates an absolute backlash of consequences downstream, and Allborn demonstrates the consequences. Because what Allborn discusses is this conflict between in the master's program from the federal government. It says, we're going to obligate the states to implement a plan to recoup as much third-party proceeds as is possible, and that serves the primary goals of Medicaid, which one primary goal is to essentially ensure that we're taking care of the needy people of the states through the Medicaid system. But there's some tools that they use to make sure that that goal goes on in perpetuity. And one of them is that they have to ensure that Medicaid benefits are available to people so that beneficiaries get treatment. And that's why when somebody, when a provider like the Med accepts, voluntarily enters the program, they have to meet their obligation of providing the care pursuant to the guidelines of Medicaid. But number two is that they have to ensure the cost avoidance procedures, which is the third-party liability plan, because that allows money to be recouped and it allows the fiscal health of Medicaid so that it can go forward to future generations so that the people being born today can have Medicaid and their children can hopefully have the luxury of Medicaid in the future. But that has to be served by the state. And that starts with the assignment that Allborn, this court clearly states in Allborn, that the court takes control of all of that right. And that they are the alpha and the omega with that. Well, to circle back to what Chief Judge Smith said, or asked you about, I mean, I understand one party, there's a statute that says you can't bill the Medicaid recipient for more than the Medicaid charges, right? Absolutely. And you're saying as a practical matter, when there's a limited insurance pool, that if the Med gets their full $23,000, then Mrs. Robinette may not get reimbursed for her lost wages, let's say. I mean, that's the practical argument. That's what Allborn absolutely said, but it was saying it against the Department of Health and Human Services. It says that when there was a compromise settlement because of lack of insurance, et cetera, that it obligated the Department of Health and Human Services when they came back to get their third-party lien because they did it correctly. They didn't have a Med circumventing the process. They left it in control of DHHS. Let me finish. So I understand sort of the practical argument that says you're violating the statute because you're taking money away from her that would have maybe reimbursed her for her wages or some other out-of-pocket expenses. So I understand that. But what, if you had a situation where there was no insurance coverage limited issue, what would prohibit the, what, can you point to a specific statutory language, I think that's what Chief Smith was saying, that says in a case where she doesn't have a big claim and you've got a million dollars coverage that would prohibit the Med from saying, in that case, why should we have to take the lower rate when we know there's a third-party payer out there? Doesn't impact the insurance. She gets a hundred percent of her wages and pain and suffering paid. Because both the state and the 42 U.S.C. 1396 specifically limits them to a provider, to a payment that is to not exceed the Medicaid agreed upon amount. Arkansas has gone further than that. They have passed a separate statute that is 20-77-104C that also specifically prohibits any payment by a Medicaid beneficiary or their payee in excess of the agreed upon Medicaid rate. So, and the law is well settled that a tort claim that comes in is property of the patient because it's, they would be the one paying it because it comes to them and it's coming out of their pocket. Counsel, isn't there an underlying assumption that in that language you're referring to in 1396 is dealing with a circumstance in which Medicaid assistance has been sought and received and that the state has actually, the state's funds from the federal government have actually been expended to provide for Medicaid assistance? That goes back to my point is that by circumventing the process, they have rewarded, they have perverted the goals of the system. Because here's what this, here's where this case lands is that there is a lot more than $23,000 that has been billed and paid by Medicaid. All it says, if they can't get anything that's pain, suffering, mental anguish, any element other than past medical, well once the fee is gone and they take their $23,000 lien that didn't go through Medicaid, then Medicaid is going to come back and they're going to be, have to live with this decision because there's not going to be any money left for Medicaid. And why? Because they did not follow the procedure that specifically sets forth in Medicaid. You lost me there. You said there wouldn't be any money for Medicaid. Well, why would Medicaid be owed any money? Because they've paid, because the other legitimate providers have billed the stuff through Medicaid correctly. That's what I'm saying. They're the outlier. Oh, okay. So you're saying the med, the med, okay. So you're saying the med bills the $23,000 and then there's doctors and x-rays and all other kinds of people. I'm saying there's 50,000 additional providers, the med chopper and other providers who did it correctly and billed through Medicaid. Medicaid has to recoup that. When you say correctly, that was the option they chose. It's not the option they chose because the med had a responsibility under the regulation 343.00 to make every effort to identify all third party liability sources, to file claims with the third party liability sources, report payments to Medicaid administration, fax info into Medicaid, if any other recipient or third party sources are out there. So in other words... Just hold on a second. I think though the answer to the question that you posited though about the third, the other Medicare, Medicaid providers is one that actually we took a look at and there is a separate statute that says the department's claim for medical assistance payments under this subject, referring to Medicaid, has priority over any claim by medical care provider. So if I understand correctly, what that statute says is the meds taking a chance here when they don't bill, let me finish, when they don't bill Medicaid and if there's another $100,000 out there of medical expenses paid by Medicaid, they're going to be out of luck. And if they were taking a chance, I would agree with you. The difference is in all the cases they cited, the injured person went in with no Medicaid and no insurance. The decision they made was whether to agree to treat them on a lien or to enroll them and let them become eligible for Medicaid. So they were making that decision with Medicaid and the Medicaid system. Here, they're not informing the Medicaid system that there even is a choice to be made. And that's the fundamental problem. They win both ways because they're not making a choice. They're only deciding once they figure out what the best choice there is to make and they're making it without Medicaid having the benefit of anything. It sounds like you want Medicaid to be the provider of first resort as opposed to last resort. No, sir. That is not what I'm saying. But what I will say is that a case that they rely on very, very heavily discusses the last resort. And the last resort language, and it says, and this is in the Evanston Hospital case, they say, that court says, it was Congress' intent that state Medicaid agencies, not hospitals or doctors, seek reimbursement from third parties. Payer of last resort does not mean that Medicaid agencies are required to refuse payment for service when a patient is or may be entitled to third party payments. To the extent that it means that the state itself should not be stuck paying bills when another source is available, not that hospitals and doctors should reap a windfall at the government's expense. Counsel, you've pretty much used up your time. I'd give you an opportunity to save a little bit for rebuttal if you'd like. Yes, sir, Your Honor. You can continue. Mr. Hearn. Thank you, Your Honor. May it please the court, I am Don Hearn from Memphis. I represent the Appellee Regional One Health, otherwise known as the MED, which is a trauma one facility located in Memphis, Tennessee. It's also a charitable organization, a public benefit organization, and a non-profit organization. I also am here on behalf of Avectus, our agent. Their counsel, who's in the courtroom, allowed me to speak for them. Our agent, Avectus Healthcare Solutions, is a company that seeks reimbursement for medical care on our behalf, coordinates benefits, insurance benefits, and governmental benefits, and also identifies other payers and payment sources for the MED, and in many instances, like in this case, prepares and files our statutory granted hospital liens. So, it may be good to start with some of the items Mr. Scriber was speaking to on behalf of his client, Ms. Robinette. The question being to Mr. Scriber was, what is the authority for the proposition that Robinette submits is the triggering event, or the authority for the proposition that the triggering event for the balance billing and substitute billing prohibitions in Medicaid and in Arkansas Medicaid are not the billing to Medicaid and the payment by Medicaid, but rather it's the admission of a patient into a facility and the treatment of a patient, who's also a Medicaid-eligible patient, and that's it, as well as entering into some form of assignment. I'm not sure if the assignment matters, but some assignment whereby the assignment would assign to the MED, in this instance, the Medicaid beneficiary benefits. Well, I think that, isn't the bottom line issue here, the statute in Arkansas that, to some extent, is also there's a federal statute, but it says, basically, once you enter into a contract with Arkansas to provide Medicaid services, which everybody understands you did, and the contract specifically says you will abide by all the Arkansas Medicaid statutes, there's a statute that says it's the intent of 2077-105 to prohibit any payment by any Medicaid-eligible person, or his or her payee, in excess of the rate or fee for service that the medical service provider has agreed to accept in full, as evidenced by the written contract. And in the situation where, as here, I think we agree that the personal injury claim is a personal asset of Mrs. Robinette, right? Yes, Your Honor. And if the Medicaid bills for other medical providers are $60,000, and you take $23,000, and her attorney takes $17,000, there's nothing left for her out of her personal claim. So why isn't that $23,000 money that's coming from her? Well, Your Honor, thank you for the question. It's certainly, many courts have held, even Tennessee Court of Appeals in the West case have held that the debt is that of the patient, not the tortfeasor, because we've certainly made that argument that the lien attaches to the tortfeasor's debt, and they disagreed. I think the lien, frankly, is an attempt to collect a debt from another source, but that's not how the courts have read the statute. They've pretty much consistently held that it is an attempt to collect against the patient, so we can't get around that. But the question... So if the law is this attempt to get against the patient, then why, I don't understand how you can take her personal injury funds and say you're not billing in excess of the statutory amount. Well, it's another good question. The question becomes, when does this statute take effect? And that's what I think this case is all about. The statute that Your Honor cited, 20-77-104-C, is that the one? Yes. And it specifically states two things. One, that the service provider has, one, agreed to accept this payment in full. There's not a payment that's been made, I can tell Your Honor. And how we construe the statutes is that a payment must have been made. And this statute is called a double-billing statute. I don't know if we put that in our briefs, but it is not a statute that's intended to handle issues when money has not been billed. It is a statute that was specifically enacted for the purpose of limiting double-billing and limiting what also Arkansas calls duplicate billing. And if I could point, Your Honor, since it may be ambiguous, I'm not saying it is, I think it only applies when there is an agreement to accept an amount as payment in full, meaning a bill has been submitted and will be paid, and we've agreed to take the money. That's not what happened in this case in that before a bill's paid. The appellant's position, as I understand it, is that because you are a Medicaid provider, or one willing to accept Medicaid payment for provision of medical services, that that is what limits you to being able to recover no more than what Medicaid would have paid for the services you render. Correct. That's Mr. Robinette's position. And the court, the Miller Court that he spoke of earlier, Miller Court... Why is that wrong? It's wrong because, well, wrong because the Court of Appeals and all the courts that have looked at that question and analyzed whether or not, when exactly do the balanced billing prohibitions take effect, they've all concluded that the prohibitions take effect when Medicaid is billed and when Medicaid pays the provider. Which circuits have ruled on this? The Fifth Circuit has, and Miller v. Gorski, and admittedly the other three, the Second Circuit, the Sixth Circuit, and the Seventh... Yeah, the Seventh Circuit have all ruled on them as well, and that would be Spectrum and Evanston, and the first one is a Second Circuit case, but it's in a footnote. And admittedly, they're all dicta, but they were very, and Judge Marshall noted that they're dicta, but they were very integral to the decision they made because, you know, the question in those cases was, are providers allowed to substitute bill? And we all know what substitute billing is, where you send a bill to Medicaid or Medicare sometimes, you get the money, and then you hold on to it, and if you find a bigger pot of money somewhere, you return the money, and that's what they call substitute billing, and these courts have found that that's not okay either. Everybody knew balanced billing was a big no-no, but substitute billing, they had some regulations that permitted it, and these courts struck down those state regulations. But in doing so, they noted that Evanston Hospital, for example, or Spectrum facility in the Sixth Circuit could have made a different decision. They said, you wouldn't be bound by the balance billing prohibition in Medicaid, and you wouldn't be bound by the substitution prohibition in Medicaid if you had not taken Medicaid money in the first place. And they are very direct about that, and the Miller case in the Fifth Circuit followed these other cases in dicta and did a very excellent analysis of the language of the Medicaid statutes and regulations, and you have to read these regulations like the court did as a whole and working them together, because if you do read the regulation in Mr. Scriber's sites, 42-1396-AA-25C, if you read it in a vacuum, you may believe that that's what they intended, but when you read all the other sections together, such as Section H of that section and Section I of that section, these all are intended, and this is what Justice Marshall found as well, that they have the phrase, when claims have been paid, or they say, when have been paid twice, and you can find those in the statutes. I don't think we put them in our brief, but Judge Marshall certainly noted them in his order, and it was clear. Judge Marshall had no problems whatsoever finding that the operative effect of the balance billing prohibition was simply submitting a bill and receiving money from Medicaid. But the argument, the counterargument to that is, and I guess what we have to decide, is that do you have the right to make that decision on a case-by-case basis when the person's admitted, or did you agree to comply with the Arkansas statute on prohibition against what you call double billing, but seeking excess payments from the patient at the time you signed the contract with the state of Arkansas? Another good question, and I think looking at Judge Marshall's opinion, the contract is silent, and he noted that, and I agree with him. The contract's silent as far as a participation contract. It says we need to, the provider will agree to care for patients, not discriminate against patients, and... But it does say you must comply with, it's not silent on the requirement that you must comply with whatever the Arkansas statute says. That's correct. It's just a catch-all. And as your opponent points out, that's one of the problems. But I was just looking back at the Miller case, which is the one that you rely upon most heavily. There, the court went out of its way to say that the relevant Louisiana statute said you must seek reimbursement, you'll be in the hospital, must seek reimbursement from the third party before you can even bill Medicaid. And you don't have a similar, and so the court said, well, if you've got to go to the third party, you can bill them the Medicare rate, or you can try to get reimbursement for your full RAC rate. You don't have that type of statutory language in Arkansas, do you? Well, no, Your Honor. Because you have to go to the third party, and only then, after you come up short, can you bill Medicaid. Correct. We do not have that type of language. We don't have a statute that requires us to go bill a third party before we bill Medicaid. But we also don't have a statute in Arkansas that requires us to bill Medicaid at all. And so the question becomes, what is the result of not billing Medicaid? And part of the problem is this. When you read the rest of the statute, Your Honor, like Section A, where it says, it's another prohibition, but you're not, it says basically you're not allowed to bill a Medicaid-eligible person for any services for which payment is either payable in full or has been paid by the program. And this is an interesting argument that I've been trying to deal with, that Ms. Robinette proposes, is that the term payable means that upon admission to the med and upon treatment at the med, Medicaid-eligible patient's claims are indeed payable before the med submits a claim to Medicaid. And this is challenging, because it's not a very simple claim. I mean, we're a level one trauma center. There's surgeries, toxic lab reports, all kinds of different providers. There's helicopter charges and ambulance charges. And until you adjudicate that claim or until somebody adjudicates the claim, meaning you submit the claim to Medicaid and they tell you if it's proper, if it's clean, if it's medically necessary, it could be late. There's all kinds of reasons they can deny it. There's thousands of charge numbers and service charge numbers. So until that claim is processed for payment and then they agree they're going to pay it, I can't see how it would be payable simply because it can maybe be paid. That makes it very difficult for the med. And then the argument goes that the med is then, according to Robinette's theory, the med would then be limited to reimbursement to the Medicaid rate from any source before they even know what's covered. I don't think practically they can do that. They can understand that, I don't know if I'm going to get paid $25,000 or $30,000 or $40,000 on this particular event, because I have no way to know if it's paid or payable. What do you say to the argument that, what if there's another, in this case, $90,000 in Medicaid reimbursed charges out there and you get the first $23,000, you're actually taking money away from Medicaid? I'm sorry, can you repeat the question? Well, let's say there's, you say, as I understand there's a lot of other medical, there's helicopter ambulance, there may be post-hospitalization doctors, rehabilitation, all of which may have been paid by Medicaid, because she's Medicaid eligible. Could have been, yes. Let's say that's $90,000 and you take the first $23,000, there's not enough left to reimburse Medicaid for those expenses, so you're having the practical effect of taking it away from Medicaid. I understand your question now, I appreciate it. And I don't mean to miss, the Med typically bills all of that in one package. It's all going to come together. Now it may go to different pockets at the end of the day, because there are some different centers throughout Medicaid, I mean, throughout Region 1, but there's one billing center that does it all, so I'm not sure that that's an area. But he's saying other providers. Other providers. The ambulance. The ambulance service. You don't bill for the helicopter, do you? I think we bill for the helicopter, but... I mean, he said there were $60,000 in paid Medicaid bills. Is he wrong about that? I don't know. It wasn't a fact in the complaint. But let's say there was. If there was $60,000 and Medicaid paid it. If Medicaid paid it, I wouldn't see that to be a problem. Medicaid still has the right to collect money for that. What if her bills are not continuing, Medicaid's providing them, and it gets to a point where they get up over $100,000 or some number where you take the first $23,000 and you're taking money from Medicaid? That scenario... Is that okay to do that? I wouldn't think so. That's not what we tend to do, is take money from Medicaid. But if they elected... I mean, they'd either make an election. Region 1 will make an election on the front end, generally, whether the... You know, obviously, the issue is reimbursement, and Region 1's a public company. They're not a for-profit company, so it's not a money grab, but it's more how can we keep things running here smoothly, and who do we bill to do that? But no, we certainly... I mean, the windfall there, I don't know who would get that one. But, Your Honors, this statute, again, I know that we... You know, the question of this statute as to whether it is ambiguous or not, as to what it says, because there's obviously disagreeing and I'm talking about ACA 20-77-104C. And the legislative history states that we pulled up states that it was indeed intended to correct the problem of double billing. It says it is hereby found, and this is found on page 29 of a Vectis' brief. They quoted it for us, but it says it is hereby found to determine that the system of double billing or receiving duplicate payment for the same medical services to a Medicaid-eligible has been practiced by a limited number of medical providers in this state, and it is further determined that such practices are unethical and present a severe financial hardship to Arkansas citizens and their families. So, the intent of the statute, I think it's very clear that that's what the statute was created to correct. And if you also look at... Because, as I said, these statutes have to be read as a whole. If you also look to the next statute, Section 105, 20-77-105, it says that a provider may not seek or receive double or duplicate payments for the same services, and they list penalties for what will happen there. So, read together and read consistent with the scheme of the Medicaid statutes, we don't believe that these balanced billing prohibitions... I mean, we don't read this to provide that the balanced billing prohibitions kick in absent a payment, an initial payment from Medicaid. The contract contains a provision, sub J, that says that Arkansas has prepared a provider manual of procedures, rules, regulations, et cetera, and that manual is considered part of the contract and you agree to abide by it. Since it's not discussed, I take it the manual doesn't talk about this at all? Well, we did cite some provisions of the manual and I've added... No, maybe I didn't add them for the manual, but we cited the regulations for the manual and they're available online. Are the regulations different from the manual? I guess that's what I'm getting at. Yes, great question. The provider manual is a mirror image of the regulations. They simply print the regulations off, stick them in a manual, and give them to the providers and make them available to the providers. The regulations we cited, 16.06.35-341, this section is actually one called Other Payment Sources, and it talks about other payment sources and some of the things that providers and participants need to do to get other payment sources, and I believe Mr. Scriber read this provision. It says, in no case may the beneficiary be One, it says on paid claims, which is very different than can't be billed to Medicaid allowable on payable claims or some other language. But more importantly, the first section here of 341 says that the following, meaning these following sections, is an explanation of the patient's and the provider's roles in the detection of third-party sources and in the reimbursement of third-party payments to the Medicaid program for services that So an examination of the regulations supporting these statutes bring some clarity to it, I believe, because Council, a medical provider like you represent, when do they have to make this election? Well, they have a year Can they bill and then figure out, well, we're not going to get anything that way, so let's go through Medicaid? Can they kind of game the system? Well, I mean, do they gamble, so to speak, as seems to be the presentation of this case? I mean, I take the risk. They do, they do take risks. But what but what they do, and part of what AVECTUS helps with is identifying, you know, possible sources of payments. I mean, that instead of, you know, used to be a shotgun approach. And a lot of hospitals have done this over the years. That's why there's a lot of case law on this. But now they take a very deliberate, controlled approach to determine, you know, what the likelihood of recovery would be in and whether the med can benefit from that to a degree. Once you make the election, well, I guess you have up to is it six months or a year to bill Medicaid? I believe it's a year. So you could you have a year to figure out if there's a third party source, if you think that's not going to work out, you can bill Medicaid. But once you bill Medicaid, you know, you can't go back. Under all the authorities that I've read, and that all the authorities that Justice Marshall look for, I agree. Every one of them says that. And we haven't found one that would support another reading of the statutes. Thank you all. Mr. Schreiber, you pretty much used your time, but we'll give you a minute to Yes, sir. I'll be extremely brief. And I'll just tell you, I cannot do the all born decision justice. But reading it would be very enlightening because it specifically holds in the Supreme Court of the United States so held that Arkansas retained complete rights over any third party claims. And those those were never assigned to the med. And that decision absolutely states is to 100% certainty that the state of Arkansas is one of the states that has retained those rights exclusively and that they are the only ones that can recover third party claims. So their procedure is absolutely illegal. And it's clear in the in the all born case, all born also specifically states that medical liens on injury claims constitute claims against persons property. So they answer that question for you verbatim. And the regulations that I cited that are in our brief, those are what you were asking about. As far as the manual, they specifically say that they can't do what they're doing. They've got to use Medicaid report this, etc, etc. And what they're trying to do to cite their case again, the Evanston case that court cited summed it up real well. The have your cake and eat it too. Let's let's not make a decision. Let's just wait until we can figure it all out. And then there's then it's not a decision. We just take the best option. It says the hospital seeks to turn Medicaid upside down by converting the system into an insurance program for hospitals rather than indigent patients. That's what's happening here. They're waiting. Thank you. And saying, and thank you, Your Honor. Court appreciates both counsel's presence in argument to the court this morning. We'll take your case under advisement, render decision in due course. Thank you.